**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09 CR 152 |
| | ) | |
| KIM EVANS, | ) | |
| DEZMOND SWANSON, and | ) | |
| CORLEY SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Kim Evans and Corley Smith have filed motions to (1) quash Defendant Smith's arrest and (2) suppress evidence that law enforcement agents obtained from Defendant Smith and a car in which Defendants were traveling on February 20, 2009. The Court held a suppression hearing on March 18, 2010, during which the government presented certain documentary evidence, and three witnesses testified credibly: Federal Bureau of Investigation Special Agents Timothy Bacha, James Stover, and Craig Heidenreich, all of whom were present when Defendants were arrested and have extensive experience investigating bank robberies as members of the FBI's Violent Crimes Task Force. After closely examining the evidence presented in connection with Defendants' motions, including the demeanor and credibility of the witnesses who testified during the suppression hearing, the Court denies the suppression motions.[1]

---

[1] At the conclusion of the suppression hearing, the Court provided the parties with an opportunity to make oral arguments, but Defendants requested that the Court instead enter a briefing schedule. (3/18/10 Tr. ("Tr.") at 94-95.) The Court granted that request, gave

**LEGAL STANDARD**

If law enforcement agents conduct a warrantless search, "the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)). Furthermore, courts uphold warrantless arrests if the arresting law enforcement agents "have probable cause to believe that the individual engaged in criminal conduct." *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009). The Federal Rules of Evidence generally do not apply at suppression hearings. *See* Fed. R. Evid. 104(a); Fed. R. Evid. 1101(d)(1); *United States v. Matlock*, 415 U.S. 164, 173-74, 94 S.Ct. 988, 994-95 (1974); *United States v. Severson*, 49 F.3d 268, 271 n.2 (7th Cir. 1995).

**FACTUAL BACKGROUND**

According to eyewitnesses, at approximately 1:30 p.m. on February 16, 2009, four black males, including one who brandished a silver revolver, robbed the Suburban Bank & Trust located at 10350 South Cicero Avenue in Oak Lawn, Illinois ("Suburban Bank Robbery"). (R. 1-1, Heidenreich Aff. at ¶ 3.) After the robbers entered the bank and ordered everyone to the ground, two of the robbers appeared to stand guard, as the other two went behind the teller counter and ordered bank employees to put money from teller drawers into a bag. (*Id.*) One of the robbers reportedly wore a black hat with large white letters, including the last letter "Y." (*Id.*) Witnesses reported that the robbers fled in a two-door, turquoise-colored sedan that had

---

Defendants nearly a month to submit their briefs, and encouraged the parties not to timely submit their briefs in light of the June 14, 2010, trial date and the large amount of time allotted for briefing. (*Id.* at 95-96; R. 86, 3/18/10 Minute Order.) Despite that encouragement, Defendant Evans did not file a brief.

been waiting for them. (*Id.*) This information from the eyewitnesses was provided to the FBI.

According to separate eyewitness accounts, at approximately 4:15 p.m. on February 16, 2009, four black males, including one who brandished a silver revolver, robbed the Chase Bank located at 4200 Dempster Street in Skokie, Illinois ("Chase Bank Robbery"). (*Id.* at ¶ 4.) After the robbers entered the bank and ordered everybody to the ground, two of the robbers appeared to stand guard, while the other two reportedly went behind the teller counter and ordered bank employees to put money from the teller drawers into a bag. (*Id.*) One of the robbers was wearing a black hat with several large white letters, including "ITY" as the last three. (*Id.*) This information surrounding the Chase Bank Robbery was provided to the FBI.

Surveillance images taken during the Suburban Bank Robbery and Chase Bank Robbery revealed that the robbers from both incidents appeared to be wearing the same clothes. (*Id.* at ¶ 5.) This, combined with the similar manner in which both robberies were conducted, led the FBI to suspect that the same robbers committed the Suburban Bank Robbery and Chase Bank Robbery. (*Id.*)

On or about February 20, 2009, an FBI informant notified law enforcement that the robbers responsible for the Suburban Bank Robbery and the Chase Bank Robbery were gang members who resided in the area of 7300 South May Street in Chicago, Illinois, and that they intended to rob another bank that day. (*Id.* at ¶ 6; Tr. at 83, 89.) The informant also told law enforcement that the robbers responsible for robbing the Suburban Bank and Chase Bank drove a dark green, two-door Cadillac sedan. (R. 1-1, Heidenreich Aff. at ¶ 6.) An FBI special agent told Agent Heidenreich before 6:00 p.m. on February 20, 2009, that he previously had worked for years with the informant, who had provided reliable information to law enforcement. (Tr. at

73-74, 91.)

At around 10:00 am on February 20, 2009, Agents Bacha, Hedenreich, and Stover attended a briefing that provided the following information that the informant had supplied to the FBI: (1) an individual by the name of Kim, a black male between thirty and forty years old, was a leader of a group involved in suburban-Chicago bank robberies; and (2) some members of that group resided in the area of 73rd and May Streets in Chicago. (*Id.* at 7-8, 38, 48.) After the briefing, the informant also conveyed to the FBI that (1) "Kim" was on home confinement and had recently cut off his electronic monitoring bracelet, (2) two males with nicknames of possibly Moncho and Smiley had been involved in the earlier bank robberies and were standing on the street near 73rd and May, and (3) "Kim" would soon be arriving there in a green Cadillac to pick them up and rob another bank. (*Id.* at 9, 36.) The FBI then identified "Kim" as Defendant Kim Evans, who had an outstanding warrant for a parole violation and was known to have been associated with the 7300 block of South May. (*Id.* at 10, 49.)

At approximately 11:30 a.m. on February 20, 2009, FBI agents – including Agents Bacha and Stover – observed three or four black males drive away from 7301 South May Street in a dark green, two-door Cadillac. (R. 1-1, Heidenreich Aff. at ¶ 7; Tr. at 11, 13, 30.) At around 11:45 a.m., Agent Bacha received an email from another FBI agent containing two photos of Defendant Evans. (Tr. at 50; Gov't Ex. 2.) Over the next two hours, Agents Bacha and Stover, among others, surveilled the green Cadillac as it went to various locations in the general vicinity of 73rd and May. (Tr. at 12-13, 31.) At around 2:15 p.m. the surveillance team lost sight of the Cadillac and returned to the area around 73rd and May. (*Id.*) Prior to losing sight of the Cadillac, Agent Bacha understood that various individuals got into and out of the Cadillac. (*Id.*

4

at 60.)

According to eyewitness accounts, at approximately 4:00 p.m. on February 20, 2009, three black males, including one who brandished a dark-colored handgun, robbed the Fifth-Third Bank located at 2240 Main Street in Evanston, Illinois ("Fifth-Third Bank Robbery"). (R. 1-1, Heidenreich Aff. at ¶ 8; Tr. at 13-14.) After the robbers entered the bank and ordered everybody to the ground, one robber appeared to stand guard, while the other two went behind the teller counter and ordered bank employees to put money from the teller drawers into a bag. (R. 1-1, Heidenreich Aff. at ¶ 8.) According to the Fifth-Third Bank Manager, a teller placed approximately $810.00 in United States currency in the robbers' bag. (*Id.*) Someone also placed a dye pack in the bag. (*Id.* at ¶ 10.) The robber who brandished the dark-colored handgun wore dark pants, a black mask, and a dark jacket with yellow sleeves and the letter "N" on the front-left side. (*Id.* at ¶ 9.) Another robber was wearing a black mask and a black, sleeveless, puffy jacket with a black "hoodie" underneath. (*Id.*) The third robber wore blue jeans, a black mask, and a white "hoodie" with a black stripe in the middle-back of the hood, a large black design on the back, and a smaller black design on the front-left side. (*Id.*) Shortly after the Fifth-Third Bank Robbery, Evanston Police Department officers noticed red-dyed United States currency and an exploded dye pack approximately two blocks from the Fifth-Third Bank. (*Id.* at ¶ 10.) The police officers reported details of the Fifth-Third Bank Robbery to the FBI. (*Id.*)

Between around 4:15 and 4:30 p.m., Agents Bacha and Stover received information that a bank robbery had taken place at the Evanston Fifth-Third Bank. (Tr. at 13, 51.) Just before 5:00 p.m., Agent Stover received an email from another FBI agent regarding the Fifth-Third Bank Robbery, which included an original alert containing a description of the suspects as three

5

black males, all of whom were wearing "hoodies" and half masks and displaying handguns. (Gov't Ex. 1 at 1-2.) The original alert in the email also specified that one suspect was last seen wearing a black and yellow jacket, one was last seen wearing a white-and-blue-striped jacket, and one was last seen wearing a white jacket. (*Id.* at 2.) In addition, the email contained an "Update #1" that law enforcement had recovered an activated dye pack a couple of blocks from the Fifth-Third Bank and that an eyewitness in that location observed three Hispanic males leaving the area in an older brown Toyota. (*Id.* at 1.) Further, the email contained an "Update #3," which provided that, according to bank staff: (1) one suspect was a five feet, nine-inch-tall, thin, black male who was wearing black jeans, black shoes, a green backpack, a shirt with black-and-yellow sleeves with an emblem on the front-left chest, and a ski mask; (2) another suspect was a five feet, nine-inch-tall, thin, black male who was wearing black jeans, black shoes, a green jacket with no sleeves, a black hoodie, and black gloves; (3) another suspect was a five feet, nine-inch-tall, thin, black male who was wearing a black-and-white jacket with a crest on the back, a white hoodie, black shoes, and a red shirt; and (4) another possible suspect had unknown descriptors. (*Id.*) The email further provided, "**All subjects considered armed and dangerous**." (*Id.* (emphasis in original).) At around 5:40 p.m., Agent Heidenreich received an email that contained pictures of the Fifth-Third Bank Robbery. (Tr. at 77; Gov't Ex. 4.)

At approximately 6:00 p.m. on February 20, 2009, law enforcement personnel, including Agents Bacha and Stover, observed that the same Cadillac that they had surveilled earlier that day was driving south on May Street. (R. 1-1, Heidenreich Aff. at ¶ 12; Tr. at 13, 19, 52.) An FBI vehicle carrying Agents Bacha and Stover followed the Cadillac without its emergency lights activated and, as the driver of the Cadillac parked the car in front of 7340 South May

6

Street, pulled in immediately behind the Cadillac. (R. 1-1, Heidenreich Aff. at ¶ 12; Tr. at 19, 52.) Agent Stover exited the car, drew and re-holstered his gun, saw that a person later identified as Defendant Smith had just exited the Cadillac from the back seat, and announced, "Police." (Tr. at 19-20, 52.) Agent Bacha also exited the FBI vehicle and yelled, "Police. Show me your hands," with which Defendant Smith complied. (*Id.* at 52-53, 69.) The Cadillac then sped away, and Agent Stover heard a collision. (R. 1-1, Heidenreich Aff. at ¶ 15; Tr. at 20-21, 53.) Defendant Smith, who had exited the Cadillac before it pulled away, was wearing a dark, sleeveless, winter coat, a black hoodie, and dark pants. (Tr. at 20-21, 44.) Agent Stover testified that all of Defendant Smith's clothing appeared to be black. (*Id.* at 44.) When Agent Stover reached Defendant Smith, he handcuffed and patted down Smith, who provided his name upon questioning. (*Id.* at 21.) About ten minutes later, Agent Stover reviewed photographs of the Fifth-Third Bank robbers that had been emailed to another FBI agent, and he saw that one of the robbers appeared to be wearing the same clothes as Defendant Smith. (*Id.* at 23-24.)

When the Cadillac sped away, two FBI vehicles pursued the car with their emergency lights activated. (R. 1-1, Heidenreich Aff. at ¶ 12.) The Cadillac collided with another FBI vehicle that was approaching from the opposite direction, before hitting a parked vehicle in front of 7353 South May Street. (*Id.*) Agent Bacha then saw a person he later identified as Defendant Evans run south on May Street from the Cadillac. (*Id.* at ¶ 12; Tr. at 53.) Agent Bacha yelled, "Police, stop," but Defendant Evans continued running away. (Tr. at 54.) FBI Special Agent Mike Frasier, who was holding his weapon, also pursued Defendant Evans. (*Id.* at 55.) Agents Bacha and Frasier, along with a government vehicle, were ultimately able to block Defendant Evans' path, and law enforcement agents then detained, patted down, and handcuffed Defendant

7

Evans, who was not carrying a weapon, provided his name when asked, and matched the photo that Agent Bacha had received earlier. (*Id.* at 55-56.) Agent Bacha saw that Defendant Evans was wearing a dark-colored jacket with yellow sleeves. (*Id.* at 57.)

Law enforcement agents took Defendant Swanson into custody as he attempted to exit the rear seat of the Cadillac. (R. 1-1, Heidenreich Aff. at ¶ 12.) Defendant Swanson was wearing blue jeans and a white "hoodie" with a black stripe in the middle-back of the hood, a large black design on the back, and a smaller black design on the front-left side. (*Id.* at ¶ 13.) Additionally, after law enforcement agents informed him of his *Miranda* rights, Defendant Swanson stated that he robbed the Fifth-Third Bank with "Kim" and "Chuck," whose real names Defendant Swanson said he did not know. (*Id.* at ¶ 17.) Defendant Swanson provided details of the Fifth-Third Bank Robbery that matched witness accounts and surveillance images, and he further stated that "Kim" was the driver and that "Chuck" was in the front passenger seat. (*Id.*)

FBI agents, including Agent Heidenreich, subsequently searched the Cadillac "incident to the arrest" and found a black hat with large white lettering reading "SECURITY" and, in the trunk, a black, .22 caliber revolver that is similar to the gun that the robbers involved in the Fifth-Third Bank Robbery had used. (*Id.* at ¶ 16; Tr. at 81.) Law enforcement agents also purportedly found (1) in the Cadillac's trunk "one tan work book, a black knit cap, . . . kitchen knife, a Silverhawk security hat, [and] a black face mask"; and (2) in the Cadillac's passenger compartment "two black stocking hats, miscellaneous papers, two black gloves, one black mask, a pair of black gloves and black knit gloves, a brown/tan leather jacket, and two plastic baggies each containing suspect narcotics." (R. 69, Gov't's Joint Resp. to Corley Smith's and Kim Evans's Mots. to Suppress at 5.) Pursuant to the FBI's standard practice, the Cadillac was towed

8

to an FBI facility. (Tr. at 81.) On April 23, 2009, law enforcement officials conducted an inventory search of the Cadillac. (R. 73, Def.'s Reply to Gov't's Resp. to His Mot. to Suppress Evid. at 11; Tr. at 81-82.)

A grand jury returned a superseding indictment against Defendants on July 21, 2009, charging each of them with one count of bank robbery in violation of 18 U.S.C. § 2113(a) and one count of unlawful use of a firearm in furtherance of that robbery in violation of 18 U.S.C. § 924(c)(1)(A). (R. 40, Superseding Indictment.) The grand jury also charged Defendant Evans with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (*Id.*)

## ANALYSIS

Defendants argue that the Court should quash Defendant Smith's arrest and suppress evidence that law enforcement agents obtained from Defendant Smith and the Cadillac because law enforcement agents did not have probable cause for the arrest and search.[2] The government responds that law enforcement agents had probable cause to arrest Defendant Smith, that law enforcement agents had probable cause to search the Cadillac, and that, in any event, law

---

[2] Defendants also argued that the Supreme Court's decision in *Arizona v. Gant*, – U.S. –, 129 S.Ct. 1710 (2009), eliminated the automobile exception to the warrant requirement. As the Court noted in its February 10, 2010, ruling, however, the Seventh Circuit has held post-*Gant* that the automobile exception still exists. *See United States v. Martin*, No. 09-1832, 2010 WL 145111, at *3 (7th Cir. Jan. 15, 2010) ("While *Gant* held that this exception excuses the need for a warrant only when the arrestee actually has potential access to the vehicle, it also emphasized, as we recently observed in *United States v. Stotler*, . . . that the Court did not invalidate other exceptions to the warrant requirement for vehicle searches."); *United States v. Stotler*, 591 F.3d 935, 940 (7th Cir. 2010) ("Because probable cause existed, the search of the truck, both cab and bed, was authorized under the automobile exception to the warrant requirement."); *United States v. Alexander*, 573 F.3d 465, 475 n.2 (7th Cir. 2009) ("We need not rely on the search incident to arrest exception, so *Arizona v. Gant* . . . has no direct bearing on this case-except that we note that the Supreme Court continues to recognize the automobile exception to the warrant requirement.").

9

enforcement agents would have inevitably discovered the evidence pursuant to an inventory search.

## I. Arrest of Defendant Smith

Defendant Smith argues that law enforcement agents did not have probable cause to arrest him because (1) the government has not established the reliability of the informant, and (2) the clothes Defendant Smith was wearing did not exactly match eyewitness accounts of those worn by one of the Fifth-Third Bank Robbery suspects. Law enforcement agents can "arrest an individual if they have probable cause to believe that the individual engaged in criminal conduct, as an arrest supported by probable cause is reasonable by its very nature." *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009). As the Seventh Circuit has observed, "it does not take much to establish probable cause." *Fox v. Hayes*, – F.3d –, No. 08-3736, 2010 WL 1337738, at *9 (7th Cir. Apr. 7, 2010). Arresting law enforcement agents "must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Id.* Ultimately, "[p]robable cause exists if, at the time of the arrest, the facts and circumstances within the [arresting officer's] knowledge 'are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense.'" *Stokes v. Board of Educ. of Chicago*, – F.3d –, No. 09-1180, 2010 WL 986639, at *4 (7th Cir. Mar. 19, 2010); *United States v. Mosby*, 541 F.3d 764, 767 (7th Cir. 2008).

Courts determine whether probable cause exists by looking at the situation "from the perspective of what the officers knew at the time of the arrest." *Fox*, 2010 WL 1337738, at *10; *see also United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006) (observing that the probable

cause analysis "is not a post hoc determination. Subsequent evidence of guilt cannot validate the probable cause determination, nor can evidence of innocence validate it. Prescience is not required of the officers.") "'Probable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances known at the time the event occurred.'" *Burnside*, 588 F.3d at 518 (quoting *United States v. Ellis*, 499 F.3d 686, 689 (7th Cir. 2007), with internal quotation from *Ellis* omitted); *United States v. Hobbs*, 509 F.3d 353, 359 (7th Cir. 2007) ("Probable cause is a commonsense, nontechnical conception that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"). "The events leading up to an arrest are viewed from the standpoint of an objectively reasonable police officer," and the arresting law enforcement agents may view events in light of their training and experience. *Burnside*, 588 F.3d at 518; *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005) ("Because police officers are entitled to rely on their experience in assessing probable cause, their judgments deserve deference.").

### A. Time of Smith's Arrest

As an initial matter, law enforcement agents did not arrest Defendant Smith until roughly ten minutes after Agent Stover handcuffed him. "An arrest occurs when, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Fox*, 2010 WL 1337738, at *9 (quoting *United States v. Tyler*, 512 F.3d 405, 409-10 (7th Cir. 2008)); *United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006). "The fault line between an investigative detention and an arrest is flexible and highly fact-intensive: 'Given the endless variations in the facts and circumstances, there is no litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop and becomes an arrest.'"

*United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004) (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994), with internal quotations from *Tilmon* omitted). The crux of the arrest inquiry is "'whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness.'" *Id.* (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)).

While Agent Stover handcuffed Defendant Smith soon after Smith exited the Cadillac (Tr. at 21), law enforcement agents may handcuff a potentially dangerous suspect – and even briefly detain him in a law enforcement vehicle – without transforming an investigatory stop into an arrest. *See Stewart*, 388 F.3d at 1084; *United States v. Thomas*, No. 02-3386, 2003 WL 22473835, at *4 (7th Cir. Oct. 23, 2003) (concluding that the defendant, suspected to have been involved in a bank robbery at which he intimated that he had a weapon, was not arrested when law enforcement agents surrounded his car, ordered him at gunpoint to get out of the car, ordered him to lie down, and handcuffed him); *Tilmon*, 19 F.3d at 1228 (noting that "handcuffing-once highly problematic-is becoming quite acceptable in the context of a *Terry* analysis"); *United States v. Aispuro*, No. 06 CR 871, 2008 WL 1968792, at *6 (N.D. Ill. May 2, 2008). As the Seventh Circuit has reasoned, "'[t]o require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*.'" *Stewart*, 388 F.3d at 1085 (quoting *Tilmon*, 19 F.3d at 1226). Roughly ten minutes after he handcuffed Defendant Smith, FBI Agent Steve Farina showed Agent Stover photographs of the Fifth-Third Bank robbers and saw that one of the robbers appeared to be wearing the same clothes as Defendant Smith. (Tr. at 23-24.) Prior to that time, Defendant Smith – whom Agent Stover had been informed was armed and dangerous – was not under arrest. *See Stewart*, 388 F.3d at 1084; *Tilmon*, 19 F.3d at 1228.

**B.      Reliability of the Informant**

In arresting Defendant Smith, law enforcement agents relied in part on an informant, and it is well settled that an informant's tip can establish probable cause. *See United States v. Banks*, 405 F.3d 559, 570 (7th Cir. 2005); *United States v. Ganser*, 315 F.3d 839, 843 (7th Cir. 2003). In assessing the reliability of information that an informant has provided, courts examine "(1) whether the informant made first-hand observations; (2) the degree of detail provided by the informant; (3) whether independent information corroborates the informant; and (4) whether the informant has proven to be reliable in past dealings with law enforcement." *United States v. Harris*, 585 F.3d 394, 401 (7th Cir. 2009); *see also United States v. Huebner*, 356 F.3d 807, 813-14 (7th Cir. 2004) ("'[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.'" (quoting *Alabama v. White*, 496 U.S. 325, 330-31, 110 S.Ct. 2412 (1990))).

The information that the informant provided was detailed and corroborated, and the informant had provided reliable information in the past. Agent Heidenreich credibly testified that, according to another FBI agent, the informant had previously provided reliable information to the FBI. (Tr. at 73-74, 91.) Specifically, another FBI agent told Agent Heidenreich that the informant's FBI contact had known and worked with the informant for years, during which time the informant had provided reliable information. (*Id.* at 91.)

Additionally, law enforcement agents were able to corroborate the detailed information that the informant had provided. By the time that Agent Stover began surveilling the Cadillac, he had received reliable information originating from the informant that Defendant Evans was the leader of a group involved in bank robberies and that he would be arriving in the area of the

7300 block of South May to pick up two individuals and then commit another bank robbery. Even though "'an informant does not have to be one hundred percent correct'" to provide law enforcement agents with actionable information, *Ganser*, 315 F.3d at 843 (quoting *United States v. Price*, 184 F.3d 637, 641 (7th Cir. 1999)), Defendants have not directed the Court to any inaccurate information that the informant provided. Further, when law enforcement agents confirmed the accuracy of the informant's prediction that someone driving the green Cadillac would pick up two individuals in the area of 7300 South May, it became clear that the informant possessed reliable, "inside information." *See Alexander*, 573 F.3d at 476 ("Police corroboration of an informant's tip is valuable in determining the reliability of the tip."); *Huebner*, 356 F.3d at 814 (concluding that "the informant's reliability was clearly demonstrated through the highly detailed and extensively corroborated (by police investigation and other informants) information he provided to the authorities"); *United States v. Oliva*, 385 F.3d 1111, 1114-15 (7th Cir. 2004). The law enforcement agents thereafter had a reasonable basis for believing that the occupants of the Cadillac would be committing a bank robbery later that day. *Ganser*, 315 F.3d at 843 (7th Cir. 2003) ("If an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.'") (quoting *Price*, 184 F.3d at 640, with internal quotation from *Price* omitted)).

### C. Probable Cause

Additionally, the law enforcement agents did not rely exclusively on the informant in arresting Defendant Smith, and, based on the totality of circumstances facing him at the time he exited his car, Agent Stover had at least a reasonable suspicion that Defendant Smith had been

14

involved in the Fifth-Third Bank Robbery. *See United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009); *United States v. Amaral-Estrada*, 509 F.3d 820, 827 (7th Cir. 2007). "When an officer initiates a *Terry* stop, he must be able to point to 'specific and articulable facts' that suggest criminality so that he is not basing his actions on a mere hunch." *Booker*, 579 F.3d at 838; *see also Amaral-Estrada*, 509 F.3d at 827 ("'Reasonable suspicion' must be based on some objective manifestation that the suspect is involved in criminal activity," although "[t]he likelihood of criminal activity need not rise to probable cause and falls well short of a preponderance of the evidence standard." (citing *United States v. Wimbush*, 337 F.3d 947, 949-50 (7th Cir. 2003))). After receiving and corroborating information from the informant, Agent Stover learned about the Fifth-Third Bank Robbery, including eyewitness descriptions of the suspects and what they were wearing. He knew that it would be possible for the Cadillac's occupants to have left the area of 73rd and May at around 2:15 p.m., travel to Evanston to commit the Fifth-Third Bank Robbery at approximately 4:00, and return to 73d and May by around 6:00 p.m. (Tr. at 14.) Agent Stover also saw that Defendant Smith was wearing clothing that substantially matched a description of the clothing worn by one of the Fifth-Third Bank Robbery suspects.

Agent Stover testified that Defendant Smith appeared to be wearing all black clothing (*Id.* at 44), and eyewitness accounts described one of the suspects as wearing a green jacket with no sleeves (Gov't Ex. 1 at 1). That does not render any of Agent Stover's actions improper, however, because the descriptions were still substantially similar and consistent with photographs of the Fifth-Third Bank Robbery. In any event, "it is generally assumed that robbers will *change* their clothes after the crime to avoid being recognized." *United States v.*

*Carpenter*, 342 F.3d 812, 816 (7th Cir. 2003) (emphasis in original).

Furthermore, based on the totality of circumstances facing Agent Stover ten minutes after he had handcuffed Defendant Smith – including that the car in which Defendant Smith was a passenger had fled – there was probable cause that Defendant Smith had been involved in the Fifth-Third Bank Robbery. *See Mosby*, 541 F.3d at 767; *Reed*, 443 F.3d at 604 (noting that car passengers are often engaged in a common enterprise with the driver (quoting *Maryland v. Pringle*, 540 U.S. 366, 373, 124 S.Ct. 795 (2003))). Accordingly, law enforcement agents lawfully arrested Defendant Smith.

## II. Vehicle Search

Defendants next argue that law enforcement agents illegally searched the Cadillac. "'The Fourth Amendment prohibits unreasonable searches or seizures, and courts exclude evidence obtained through an unreasonable search or seizure.'" *Burnside*, 588 F.3d at 517 (quoting *Mosby*, 541 F.3d at 767); *Booker*, 579 F.3d at 838. "The jurisprudence of the Supreme Court makes clear that the primary bulwark against such conduct is the procurement of a warrant from a neutral and detached magistrate." *United States v. Whitaker*, 546 F.3d 902, 906 (7th Cir. 2008) (citing *Groh v. Ramirez*, 540 U.S. 551, 575, 124 S.Ct. 1284 (2004)). Accordingly, "[a] warrantless search is per se unreasonable under the Fourth Amendment subject to a few well-established exceptions." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (citing *Gant*, 129 S.Ct. at 1716). If law enforcement agents conduct a warrantless search, "the government must show by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement." *Id.* (citing *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000)).

Under the automobile exception to the warrant requirement, law enforcement agents may conduct a warrantless search of a vehicle "where there is probable cause to believe that [the] vehicle contains contraband or evidence of a crime." *Zahursky*, 580 F.3d at 521 (citing *Carroll v. United States*, 267 U.S. 132, 153-56, 45 S.Ct. 280 (1925)). Furthermore, "[w]here law enforcement agents have probable cause to search a vehicle, they may search all areas in the vehicle in which contraband or evidence of criminal activity might be found, including closed containers, packages, compartments, and trunks." *Id.* at 523; *see also United States v. Clinton*, 591 F.3d 968, 971 (7th Cir. 2010) (noting that "police may search 'any area of the vehicle in which the evidence might be found' so long as there is probable cause to believe a vehicle contains evidence of criminal activity" (quoting *Gant*, 129 S.Ct. at 1721)).[3]

Probable cause for a search "'exists where based on a totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Zahursky*, 580 F.3d at 521 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317 (1983)). This is a "'practical, common-sense decision,'" *Burnside*, 588 F.3d at 517 (quoting *Ellis*, 499 F.3d at 689), that "requires probability, not absolute certainty, that contraband or evidence of a crime will be found." *Zahursky*, 580 F.3d at 521 (citing *United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008)); *see also Hobbs*, 509 F.3d at 359 ("Probable cause is a commonsense,

---

[3] The Seventh Circuit has repeatedly rejected Defendants' argument that the automobile exception does not apply when a suspect does not have access to his or her car. *See id.*; *United States v. Washburn*, 383 F.3d 638, 641 (7th Cir. 2004); *United States v. Matthews*, 32 F.3d 294, 299 (7th Cir. 1994). In doing so, the Seventh Circuit has observed that a suspect's ready access to a car is not the sole concern underlying the automobile exception. There are two justifications, rather, for the automobile exception that are independent from one's access to the car: (1) "a vehicle's 'ready mobility' [] makes 'immediate intrusion' necessary to prevent the destruction of evidence," and (2) individuals have a "lesser expectation of privacy in a vehicle." *Zahursky*, 580 F.3d at 522 (quoting *Washburn*, 383 F.3d at 641).

nontechnical conception that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" (quoting *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657 (1996))). "In determining whether there is probable cause to search, law enforcement officers may draw reasonable inferences from the facts based on their training and experience." *Zahursky*, 580 F.3d at 521 (citing *Reed*, 443 F.3d at 603).

Probable cause to search the Cadillac existed here "because the totality of the circumstances indicated a 'fair probability'" that law enforcement agents would find evidence of the Fifth-Third Bank Robbery in the vehicle. *Clinton*, 591 F.3d at 971 (quoting *Zahursky*, 580 F.3d at 521). The same facts that establish probable cause for Defendant Smith's arrest also establish probable cause to search the Cadillac. Specifically, the FBI had received information from an informant that the FBI had found to be reliable in the past, who said that an individual named Kim, with features matching those of Defendant Evans, would be arriving at around 73rd and May in a green Cadillac to pick up two males and subsequently rob a bank. Law enforcement agents who were surveilling that area verified that the informant's information was accurate. Furthermore, Defendants Evans and Smith matched eyewitness descriptions and pictures of the bank robbers that had been transmitted to the law enforcement agents who conducted the search and arrests. In addition, law enforcement agents may base an arrest in part on a suspect's flight. *See Douglass*, 467 F.3d at 625; *United States v. Shepherd*, No. 05-1631, 2005 WL 3466081, at *2 (7th Cir. Dec. 19, 2005). After the Cadillac sped away from law enforcement agents and crashed into another car, Defendant Evans disregarded Agent Bacha's directive to stop and fled on foot. (Tr. at 53-54.) Finally, Agent Bacha saw that Defendant Evans matched the photo that he had received earlier in the day and knew that there was an

outstanding warrant for Defendant Evans' arrest. (*Id.* at 56.) Law enforcement agents therefore had probable cause to arrest Defendant Evans and to search the Cadillac.[4]

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motions to suppress.

Dated: April 21, 2010                                ENTERED:

*[signature]*
AMY J. ST. EVE
United States District Court Judge

---

[4] Because law enforcement agents lawfully searched the Cadillac on July 20, 2009, the Court need not address the government's inevitable discovery argument.